# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 6, 2011        Decided December 9, 2011

No. 10-1330

ARC BRIDGES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 10-1360

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Raymond C. Haley III* argued the cause for petitioner. With him on the briefs was *William C. Vail*, *Jr.*

*Nicole Lancia*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*,

Supervisory Attorney. *Amy H. Ginn* and *Jill A. Griffin*, Attorneys, entered appearances.

Before: SENTELLE, *Chief Judge*, WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Arc Bridges, Inc. petitions for review of a National Labor Relations Board order finding it in violation of § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (3). The Board cross-petitions for enforcement. The question presented is whether Arc Bridges established annual wage increases as a term of employment and then unlawfully refused to implement a wage increase after its employees became unionized.

Arc Bridges is a non-profit Indiana corporation, exempt from federal taxation under § 501(c)(3) of the Internal Revenue Code. The company runs assisted living programs, employment counseling, and related support services for individuals with developmental disabilities. It relies heavily on state and federal funding. The American Federation of Professionals, a labor union, conducted an organizing campaign at Arc Bridges in late 2006 and early 2007. The campaign culminated in two contested representation elections: one for Arc Bridges' Day Services employee unit, the other for its Residential and Supported Living employee unit. A majority in both units voted in favor of the union.

Bargaining sessions held after the elections yielded little progress. The union demanded a fifty percent wage increase over three years, significant increases in benefits, and a variety of other changes. Management calculated that the wage and

benefits increases would consume more than a quarter of Arc Bridges' operating revenues in the first year, and an even greater share in later years. In light of those figures and the fact that Arc Bridges had a sizeable operating loss in the preceding fiscal year, management informed the union that its proposal was a financial impossibility. Management also urged the union to identify "one or two areas" of economic improvements that were "most important" to its members. The union responded by calling a strike authorization vote. The parties continued to meet after the vote, but were unable to come to an agreement.

Kris Prohl, Arc Bridges' Executive Director, had planned on granting all Arc Bridges employees a three percent wage increase in July 2007, just as she had in each of the two preceding years. But the ongoing labor negotiations caused her to shelve this plan. Prohl feared that the significant disparity between the three percent increase and the union's much larger demand would provoke a strike. She was also concerned that implementing the increase would leave Arc Bridges without any funds to meet the union's remaining demands. And she believed that a unilateral wage increase would expose Arc Bridges to a refusal to bargain charge. *See* 29 U.S.C. § 158(a)(5); *NLRB v. Katz*, 369 U.S. 736, 743-44 (1962).

At the time, Arc Bridges had 260 employees represented by the union and 121 non-union employees. Turnover among the non-union employees had recently been unusually high. In an effort to stem that trend, Prohl decided to grant the non-union employees the planned three percent wage increase in October 2007, retroactive to July of that year. She explained that the increase was to be kept confidential, and that union employees would "have to wait to see what increase, if any [would] be negotiated by the AFP." Union officials learned of Prohl's decision in March 2008 and immediately asserted that Arc Bridges "owed" an identical increase to represented employees.

Management refused, stating that it preferred to address the issue through Board adjudication.[1]

The union filed a charge with the Board claiming that Arc Bridges had violated § 8(a)(1), (3), and (5) of the Act by granting the wage increase only to non-union employees. The Regional Director issued a corresponding complaint focusing exclusively on the theory that Arc Bridges had violated § 8(a)(3), which prohibits employers from "discriminat[ing] in regard to . . . any term or condition of employment to . . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

An Administrative Law Judge dismissed the complaint after a two-day hearing. The ALJ's finding regarding Arc Bridges' wage review process played a critical role in the decision. The finding read:

> [Arc Bridges'] fiscal year extends from July 1 to June 30. For many years it has been the practice of [Arc Bridges] to review wages in June of each year as a component of the budget process, and to budget for wage increases, if financially feasible. Customarily, such wage increases are granted in July of each year. Following this pattern, in July of each of the prior 2 years, 2005 and 2006, before the Union became the employees' bargaining representative, [Arc Bridges] granted across-the-board wage increases of 3 percent to all staff, including managers and supervisors.

---

[1] Even so, Arc Bridges later offered union employees a retroactive two percent wage increase. It justified the reduced amount on the ground that revenues had declined and costs had increased since October 2007.

Recognizing that employers may withhold wage increases from unionized employees as a bargaining tactic, provided that the decision is not a product of anti-union animus, *see Shell Oil Co.*, 77 N.L.R.B. 1306, 1310 (1948), the ALJ proceeded to evaluate Prohl's wage decision under the *Wright Line* standard, *see NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399-404 (1983) (approving the burden-shifting test adopted in *Wright Line*, 251 N.L.R.B. 1083 (1980)). On this analysis, the ALJ found that there were two plausible explanations for the decision: Prohl may have withheld the increase to punish the employees for joining the union, or she may have done so to conserve limited resources and maximize Arc Bridges' leverage in the negotiations. Because the evidence did not clearly rule out the latter theory, the ALJ concluded that Arc Bridges had carried its burden of establishing that it would have taken the same action even in the absence of any discriminatory motive. *See Wright Line*, 251 N.L.R.B. at 1089.

The Board sustained the ALJ's factual findings, but disagreed with his conclusion. *Arc Bridges, Inc.*, 355 N.L.R.B. No. 199, 2010 NLRB LEXIS 379, at *2-3 (Sept. 29, 2010). The Board began by purporting to summarize the finding quoted above: "For 8 consecutive years, [Arc Bridges] annually reviewed its finances in June and, if sufficient funds existed, implemented an across-the-board wage increase in July." 2010 NLRB LEXIS 379, at *2. According to the Board, Arc Bridges' budget review process dictated that increases were "feasible" in 1999, 2000, 2001, 2005, and 2006, but not in 2002, 2003, and 2004. *Id.* at *4.

From this the Board concluded that Arc Bridges' budget review each June and across-the-board wage increase each July – "if sufficient funds existed" – amounted to "an established condition of employment." *Id.* at *10 (citing *Eastern Me. Med. Ctr.*, 253 N.L.R.B. 224, 242 (1980), *enforced* 658 F.2d 1 (1st

Cir. 1981)). Arc Bridges' refusal to maintain that condition in 2007 was, the Board held, "inherently destructive" of the employees' rights, *id.* at \*12-16 (quoting *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34 (1967)), and thus a violation of § 8(a)(1) and (3) of the Act, *id.* at \*17.[2] To remedy this violation, the Board ordered Arc Bridges to reimburse, with interest, each of the union employees "for the increases they would have received on October 12, 2007, retroactive to July 2007" – an amount equal to "the difference between their actual wages and the wages they would have received had the increases been granted to them" in the same manner as the non-union employees. *Id.* at \*17.

In reviewing the decision, we assume the Board did not mean that Arc Bridges' preparation of a budget each June had itself become a term or condition of employment. Union or no union, prudent companies plan for the future and prepare budgets based on forecasts of revenues and expenditures. In doing so they are performing an internal management function beyond the Board's competence. *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 676-77 (1981); *contrast* 29 U.S.C. § 158(d) (listing "wages" and "hours" as examples of "terms and conditions of employment"). The Board did not say otherwise. It said instead that a condition of employment resulted from the annual budget review plus the custom of Arc Bridges giving an across-the-board wage increase "if feasible" or "if sufficient funds existed." 2010 NLRB LEXIS 379, at \*4, 10. This decision, we believe, is arbitrary and unsupported by substantial evidence. 29 U.S.C. § 160(e); *see also Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1138 (D.C. Cir. 2011); *E.I. du Pont de*

[2] Although the Board hinted that Arc Bridges would also be liable under the *Wright Line* test, it declined to reach the issue. 2010 NLRB LEXIS 379, at \*3, 16 & n.9.

*Nemours & Co. v. NLRB*, 489 F.3d 1310, 1314 (D.C. Cir. 2007); *BB&L, Inc. v. NLRB*, 52 F.3d 366, 372 (D.C. Cir. 1995).

Arc Bridges points out an obvious problem with the Board's formulation. So far as we can tell, Arc Bridges did not use any particular criteria to determine when to give an increase, or the amount of the increase when it did give one. Even under the Board's formulation, there were no objective criteria for determining whether there would be any wage increase at all. The Board wrote that Arc Bridges gave wage increases when "sufficient" funds were available or when it was "feasible" to do so. 2010 NLRB LEXIS 379, at *10-11. But this seems highly discretionary, depending on management's budget forecasting, its assessment of the economic climate, its plans for the upcoming fiscal year, and so forth. The situation is thus unlike *Daily News of Los Angeles v. NLRB*, 73 F.3d 406, 411-13 (D.C. Cir. 1996), in which the amount of an annual raise was discretionary but the merit-based criteria for determining if there would be any raise were fixed. The only common theme linking Arc Bridges' wage increases is timing – a characteristic found insufficient to create a term or condition of employment in *Daily News*. *See id.* at 412 n.3.

In any event, the Board's decision contains a rather large evidentiary hole. Arc Bridges granted no wage increases in July 2002, July 2003, or July 2004 – three of the five years immediately preceding the 2007 wage decision at issue here. How then could the Board derive any established pattern or practice of the company granting annual wage increases? The Board tried to fill the gap with this explanation: "Presumably, [Arc Bridges'] annual review indicated that no across-the-board increase was warranted in those years." 2010 NLRB LEXIS 379, at *11. By not "warranted" the Board must have meant, as it said earlier in its opinion, not "financially feasible" or that "sufficient funds" did not (or would not) exist. *Id.* at *10-11.

The trouble is that there is no substantial evidence – indeed, there is no evidence at all – to support the Board's "presumably." It comes out of thin air.

Counsel for the Board admitted as much at oral argument. *See* Oral Arg. at 19:41-20:25; 21:55-23:04, 23:45-57. The Board's brief was not as forthcoming. It cites Prohl's statement that another, credentials-based type of increase was given between 2002 and 2004 "regardless of any other increases." This supposedly served as evidence that Arc Bridges granted across-the-board increases in July when it had available funds, and did not when money was short. The testimony established no such thing. To the contrary, it indicated that Arc Bridges *did* have funds available to award increases in 2002, 2003, and 2004, but chose to use the funds for other purposes. The brief's other citations to the record are of no help to the Board.[3]

Nor is it true that Arc Bridges consistently granted across-the-board pay increases, as opposed to other types of adjustments. The Board focused solely on July wage decisions made between 1999 and 2006. In July of each of those years, Arc Bridges gave either an across-the-board increase or no increase at all. But the company's history of granting July wage increases dates back further, to 1992. Between 1992 and 1998, Arc Bridges provided an across-the-board wage increase only once, in July 1997. It granted individual, merit-based increases or an increase to specific groups of employees (sometimes in

---

[3] *See, e.g.*, J.A. 119 (undated document indicating that Arc Bridges' predecessor entity based salary decisions on a variety of factors, including the "[c]ost of living," "appropriate[ness]," "annual resources available to the corporation," the "performance of the corporation as a whole," and "market studies"); *id.* at 249-50 (Prohl's testimony that she chose not to grant increases in 2002, 2003 and 2004 "for whatever reason").

addition to other increases) in each of the remaining six years. The upshot of this additional data is that Arc Bridges granted an across-the-board increase in six of fifteen years – less than half the time.

The Act requires the Board to base its factual findings "on the record considered as a whole." 29 U.S.C. § 160(e). Had the Board done so here, it could not possibly have concluded that annual across-the-board wage increases were an established condition of employment. Citing *Kurdziel Iron of Wauseon, Inc.*, 327 N.L.R.B. 155, 155 & n.3 (1998), *enforced* 208 F.3d 214 (6th Cir. 2000) (per curiam), counsel for the Board claims that the company's granting of across-the-board increases in 2005 and 2006 was itself enough to establish a term or condition of employment. We think not.

In *Kurdziel*, the employer operated two facilities, Britt and Wauseon, and granted an identical wage increase to employees at each in 1994 and 1995. 327 N.L.R.B. at 155. The employer discontinued this practice in 1996, when employees at the Wauseon facility voted to unionize. *Id.* Instead, it granted an increase only to employees at the Britt facility, which remained non-union. *Id.* The Board held that the two-year history of matching wage increases established a term of employment, and that the employer's failure to honor that term at the Wauseon plant violated § 8(a)(1) and (5) of the Act. *Id.* Here, of course, there is no evidence that Arc Bridges followed anything like the dual-facility approach at issue in *Kurdziel*. More importantly, the evidence of past wage increases in *Kurdziel* was limited to the preceding two years, in part because the Britt facility began operation in "1991 or 1992" and the Wauseon facility opened in 1993. *See id.* at 155 & n.3 (highlighting "the absence of evidence" from years "prior to 1994"). Thus, while two consecutive years of wage increases might be enough to establish a term of employment when that span constitutes 100

percent of the record evidence, it will not suffice when the employer's history dates back further. As statisticians know, a sample must be representative for inferences drawn from it to be valid. And we know that one way to reduce errors is to increase the size of the sample. In determining whether an established practice existed at Arc Bridges, the Board was not free to discount evidence contradicting the practice. *See* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). To do so in the face of a record such as this one was nothing short of arbitrary.

We therefore grant the petition for review, deny the cross-petition for enforcement, and set aside the Board's order. We also remand the case for further proceedings, in light of the Board's decision to reserve judgment on the *Wright Line* theory. *See Micro Pac. Dev., Inc. v. NLRB*, 178 F.3d 1325, 1336 (D.C. Cir. 1999).

*So ordered.*